**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

RICHARD C. ARMSTRONG,
          *Defendant-Appellant.*

No. 09-30395

D.C. No.
1:09-cr-00033-EJL-3

OPINION

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted
August 2, 2010—Seattle, Washington

Filed August 31, 2010

Before: William C. Canby, Jr., John T. Noonan and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

13095

**COUNSEL**

R. Wade Curtis, Belnap Law PLLC, Boise, Idaho, for the defendant-appellant.

Thomas E. Perez, Assistant Attorney General; Jessica Dunsay Silver and April J. Anderson, Attorneys, U.S. Department of Justice, Civil Rights Division, Washington, D.C., for the plaintiff-appellee.

## OPINION

BERZON, Circuit Judge:

Richard C. Armstrong was convicted by a jury of participating in a racially motivated assault against an African American man. Armstrong now appeals his sentence. He contends that the district court erred in imposing two enhancements: one for selecting a victim on the basis of race and one for obstruction of justice. Additionally, he argues that the sentence as a whole was procedurally flawed and substantively unreasonable. We address whether a defendant may avoid an enhancement for selecting a victim on the basis of race if his co-defendant selected the victim before he did. We decide that he may not. Because we also disagree with Armstrong's other two contentions, we affirm the sentence imposed by the district court.

## I.

We begin by reciting the evidence favoring the jury's verdict: Armstrong, Michael Bullard, and James Whitewater went to Wal-Mart around midnight on a Saturday night to buy orange juice. In the juice aisle, they noticed Raylen Smith, an African American man, shopping for milk. Smith did not interact with the three strangers but noticed they were talking and laughing among themselves. He was not aware that they were using racially derogatory remarks like "spook" and "nigger" in reference to him. On the way to the checkout aisle, Bullard told his companions that he would fight Smith, and the group began to discuss the idea. As Smith got in line

behind them, he noticed Bullard staring at him. Smith did not stare back or say anything to the group.

After Armstrong, Whitewater, and Bullard purchased the orange juice, they waited outside the store for Smith. When Smith left the store and walked to the parking lot, he was confronted by Bullard, who flicked his cigarette at Smith and asked, "Do you know what country you're in?" Smith, surprised and fearful, attempted to run away. The three men chased after Smith, Armstrong yelling, "Get him, get that fucking nigger." Bullard caught up with Smith first, at the end of the parking lot, and tackled him; both rolled down a hill toward a canal. Armstrong and Whitewater approached the fight moments later and began hitting and kicking Smith while he was on the ground. The three assailants beat Smith until he was unconscious. The assailants then fled the scene, returning to Armstrong's apartment. After bragging about and congratulating each other on the attack, they agreed among themselves that, if anyone asked, there was no racial aspect to the assault and Bullard would take the blame, "saying it was a one-on-one fight, nothing racial was ever said."

Security footage from Wal-Mart enabled the police to locate the attackers about a month after the incident. The footage showed Bullard, Whitewater, and Armstrong chasing Smith into the parking lot but did not capture the beating. Armstrong spoke to the police in a recorded interview and admitted that members of the group, including him, directed racial slurs at Smith.

The United States filed a two-count indictment against Armstrong, Bullard, and Whitewater: the first count charged the defendants with conspiring to injure, oppress, threaten, and intimidate Smith in the free exercise of his right to use a place of public accommodation free from interference based on race, in violation of 18 U.S.C. § 241; and the second with using force to willfully injure, intimidate, and interfere with Smith because of his race and because he was enjoying the

goods and services of an establishment that serves the public, in violation of 18 U.S.C. §§ 245(b)(2)(F), 2. Whitewater pled guilty to the first count.

Armstrong and Bullard went to trial. Contradicting his police interview, Armstrong denied that the group directed any racial slurs at Smith; denied that he himself had used any racial slurs that night; and denied that there was any racial motivation for the attack. Armstrong also claimed that he took no part in the assault against Smith and only chased after Bullard to pull him off of Smith. Opposing testimony by Whitewater and Smith supported the jury's finding that Armstrong had committed the offense and had done so because of Smith's race. The jury returned verdicts of guilty for Bullard and Armstrong on both counts.

The Presentence Report ("PSR") determined Armstrong's base offense level to be 12 and recommended a "victim related adjustment," because the jury determined beyond a reasonable doubt that the defendant intentionally selected the victim because of the victim's race. Under U.S.S.G. § 3A1.1(a), Armstrong's racial motivation in attacking Smith increased the offense level by 3. Thus, the PSR calculated a total offense level of 15 and a criminal history category of V, suggesting an imprisonment range of 37-46 months.

At sentencing, the court imposed not only the three-level upward adjustment under U.S.S.G. § 3A1.1(a) but also an additional two-level upward adjustment under U.S.S.G. § 3C1.1 for Armstrong's false testimony at trial, as proposed by the government in a letter to the probation officer. The court calculated a total offense level of 17 and an imprisonment range of 46-57 months. The court then imposed the lowest within-Guidelines sentence, 46 months.

## II.

We review factual findings underlying the district court's sentencing decision for clear error. *See United States v. Loew*,

593 F.3d 1136, 1139 (9th Cir. 2010). We review the district court's application of the Sentencing Guidelines to the facts for abuse of discretion. *See id.*; *see also Gall v. United States*, 552 U.S. 38, 51 (2007).

## A.

**[1]** Sentencing Guideline 3A1.1(a) provides for a three-level enhancement when "the finder of fact at trial . . . determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race . . . of any person." In this case, the jury was required to find —and did find—that Armstrong used force or the threat of force; that he willfully injured, intimidated, and interfered with Smith; and that Armstrong acted because Smith is African American. To establish the third element, the Government was required to prove that the victim's race was a motivating factor for the attack. Thus, under U.S.S.G. § 3A1.1(a), the court acted properly in imposing the three-level enhancement at sentencing.

Armstrong argues that the district court should have been required to make a separate finding as to *selection* before imposing the enhancement because there was no finding by the jury that Armstrong himself selected Smith as the victim. Because he was convicted as an aider and abettor and it was Bullard who initially chose Smith, Armstrong maintains that he did not personally select the victim, even if he was motivated by racial animus.

**[2]** The Tenth Circuit rejected essentially the same argument in *United States v. Woodlee*, 136 F.3d 1399 (10th Cir. 1998). The defendant in *Woodlee*, who was charged only with aiding and abetting a hate crime, also claimed that the evidence did not support use of the enhancement. Rather, he argued, it demonstrated that he "played no role in the selection of the victims but joined the offense only toward the con-

clusion of a crime already in progress." *Id.* at 1414. The Tenth Circuit disagreed: "[T]he victims were chosen because of their race and [the defendant] knew this fact. By aiding and abetting the continuing crime, [the defendant] must have also made the same choice." *Id*. at 1413.

**[3]** We are persuaded by the Tenth Circuit's analysis. Armstrong's insistence that the judge make a separate finding as to selection misses the point of U.S.S.G. § 3A1.1(a). The purpose of the Guideline is to punish those who have a hate crime motivation and to deter future hate crimes. It does not matter whether Armstrong was the *first* to select Smith as a victim because of his race; it is enough that Armstrong too "selected" Smith as the victim of his actions for that reason, by using force to injure, threaten, or intimidate Smith merely because of his race. *See* U.S.S.G. § 3A1.1 cmt. background ("Subsection (a) reflects the directive to the Commission . . . to provide an enhancement of not less than three levels for an offense when the finder of fact at trial determines beyond a reasonable doubt that the defendant *had a hate crime motivation* (i.e., a primary motivation for the offense was race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of the victim).") (emphasis added). Although the jury was not asked to find that Armstrong personally selected Smith in the first instance, it was asked to and did find that Smith was the victim of Armstrong's attack because of his race. That is sufficient reason to impose the enhancement.

## B.

**[4]** Sentencing Guideline 3C1.1 provides for a two-level increase in the offense level if a defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice. An example of obstructive conduct is "committing, suborning, or attempting to suborn perjury." U.S.S.G. § 3C1.1 cmt. n.4(b). A witness commits perjury if he gives false testimony under oath or affirmation, "concerning

a material matter, with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993); *see* 18 U.S.C. § 1621. The sentencing judge need only find by a preponderance of the evidence that the defendant committed perjury. *See United States v. Tidwell*, 191 F.3d 976, 982 (9th Cir. 1999).[1]

Although it is "preferable" for the court to make a separate and clear finding for each element of the alleged perjury, doing so is unnecessary where the court makes a determination of an obstruction of justice "that encompasses all of the factual predicates for a finding of perjury." *Dunnigan*, 507 U.S. at 95.[2] The district court in Dunnigan, for example, found that *"the defendant was untruthful at trial with respect to material matters* in this case. [B]y virtue of her failure to give truthful testimony on material matters *that were designed to substantially affect the outcome of the case*, the court concludes that the false testimony at trial warrants an upward adjustment by two levels." 507 U.S. at 95 (quoting district court decision). The Supreme Court upheld the district court's sentencing decision even though it lacked a separate and clear finding for each element of perjury. The Court stated, "Given the numerous witnesses who contradicted respondent regarding so many facts on which she could not have been mistaken, there is ample support for the District Court's finding." *Id.* at 95-96.

---

[1]Armstrong maintains that the judge was required to find beyond a reasonable doubt that he had committed perjury, but the case he cites does not support his argument; on the contrary, it applies a preponderance of the evidence standard. *See United States v. Alvarado-Guizar*, 361 F.3d 597, 607 (9th Cir. 2004).

[2]The factual predicates for a finding of perjury are that the defendant's testimony under oath was false; that the defendant knew that the testimony was false, so as not to punish him for faulty memory; and that the false testimony was material to the matters before the court. *See Dunnigan*, 507 U.S. at 95.

Here, the district court found that Armstrong had perjured himself in testifying that he did not conspire to assault the victim because the victim was African American.[3] Furthermore, Armstrong's denial of "using racial slurs referring to the victim during and after the attack" was contrary to the evidence and "*material* to [Armstrong's] racial motivation." (emphasis added). Thus, the court made a finding that encompassed all of the factual predicates for a finding of perjury. Additionally, as in *Dunnigan*, Armstrong could not be mistaken about his racial motives or his involvement in the assault against Smith.

[5] Armstrong argues that his testimony was a general denial of guilt that did not amount to perjury. He maintains that if he did give a false statement, it was either not material, in that it would not influence or affect the issues under determination, or not willful, in that he believed the false statement to be true at the time he gave it. Although the § 3C1.1 "enhancement 'is not intended to punish a defendant for the exercise of a constitutional right' such as a 'denial of guilt,' " it does apply to " 'a denial of guilt under oath that constitutes perjury.' " *United States v. Jimenez*, 300 F.3d 1166, 1171 (9th Cir. 2002) (quoting U.S.S.G. § 3C1.1 cmt. n.2). If false testimony is material to and significantly impedes the administration of justice with respect to prosecution or sentencing, it is more than mere denial of guilt. While a defendant "has a right

---

[3]Armstrong claimed that he took no part in the assault against Smith, that he had only chased after Bullard in an attempt to stop him, and that there was no racial aspect to the assault. The district judge explained why he rejected this position, stating: "[T]he jury determined beyond a reasonable doubt that you, along with the others, selected the victim because of his race, color, and national origin . . . . I know your story was that you went down there and hit Mr. Bullard in the back and tried to pull him off. That is just not the believable evidence." The judge then drew from the record the bases for the jury's finding. He cited Armstrong's extensive use of the "N-word"; the fact that Smith was the only African American in the store; the footage from the surveillance camera showing Armstrong and the others waiting for and then running after Smith; and the absence of any other reason for attacking Smith.

to put the government to its proof . . . 'there is no constitutional right to lie.' " *United States v. Baker*, 200 F.3d 558, 562 (8th Cir. 2000) (quoting *United States v. Lange*, 918 F.2d 707, 709 (8th Cir. 1990)); *see also Dunnigan*, 507 U.S. at 96 ("[A] defendant's right to testify does not include a right to commit perjury.").

[6] Here, the prosecution pointed to, and the district court relied on, specific and material instances of Armstrong's false testimony. Although Armstrong insists that the prosecution did not plead the alleged false statements with sufficient specificity, we disagree. The prosecution, at the sentencing hearing and in a detailed letter to the Presentence Investigator ("PSI"), explained that Armstrong's statement denying that he and his co-conspirators used racial slurs in reference to Smith before, during, and after the attack "was contradicted by Raylen Smith, James Whitewater, Natalie Whitewater, and an excerpt of the video-taped Nampa Police Department interview of defendant Armstrong, which the United States presented as an exhibit in its rebuttal case." Armstrong currently claims that he never denied using racial slurs to refer to Smith, and that, if anything, he only stated truthfully that he couldn't remember whether he had used racial slurs. In fact, Armstrong clearly and unmistakably testified that he had never used the "N-word" with regard to Smith on the night of the attack. When asked whether he had used the word "nigger" while he was inside the store, in the exit foyer, or outside the store, Armstrong flatly and outrightly stated that he had never called Smith by any racial slurs. Contrary to this testimony, he stated in his interview with the police that he was *sure* he had called Smith a "nigger" on the night of the assault. Whitewater and Smith also testified that Armstrong used racially derogatory terms that night.

[7] Moreover, the prosecution specifically pled, and the district court found, that Armstrong testified falsely in denying his involvement in the assault and his racial motivation.[4]

---

[4]The prosecution's letter to the PSI reads: "[D]efendant Armstrong denied at trial that he committed these offenses because Raylen Smith was

Armstrong contends that the judge relied solely on the inconsistency between the jury's verdict and defendant's testimony, and therefore failed to "personally make a judicial finding of perjury based on the records." The judge made clear, however, that he had considered the record and all of the arguments of both parties and found Armstrong's testimony not logical when compared to all of the other evidence in the record. The judge stated:

> . . . I just think if you step back from the evidence and just look at it with an open mind, you can clearly see that you perjured yourself when you testified that you did not conspire to assault the victim because he was African American. It is just not logical. It certainly is not consistent with the language you were using, some of the past problems you have been in.

The court therefore did not clearly err in finding that Armstrong testified falsely with respect to material matters, namely his use of racial slurs, his involvement in the assault, and his own racial motivation.

## C.

Finally, Armstrong argues that the sentence was "procedurally flawed and substantively unreasonable" because the court failed to consider the § 3553(a) factors,[5] thereby treating the

African American. This was contradicted by witness testimony regarding defendant Armstrong's actions and statements before, during, and after the attack, as well as by the evidence of defendant Armstrong's racial animus (use of racial slurs, dissemination of racist jokes, drawing and display of symbols of white supremacy, tattoos of swastikas and Nazi 'SS' lightening bolts)." At the sentencing hearing the prosecution again clearly specified that Armstrong "denied participating in the offense. He denied chasing after Mr. Smith. He denied physically attacking Mr. Smith." Because the prosecution sufficiently delineated which statements were false, Armstrong's right to due process was not violated.

[5]18 U.S.C. § 3553(a) lists the factors to be considered in imposing a sentence, such as "the nature and circumstances of the offense and the his-

Guidelines as mandatory.[6] The judge made clear that the Guidelines were not binding; he stated:

> [J]ust for the record, having reviewed and looked at all the 3553(a) factors, and taking into consideration counsel's arguments concerning the same, the Court is going to sentence you to the Bureau of Prisons for a period of 46 months, which is the low end of the Guidelines. The Guidelines are not binding on the Court, but you are trying to look at it as one factor so that sentencing is fair and equitable under the circumstances.

The district judge also discussed several of the 3553(a) factors, namely the "nature and circumstances of the offense" and the "history and characteristics of the defendant." 18 U.S.C. § 3553(a). The judge then decided that 46 months would "reflect[ ] the seriousness of the offense, promote[ ] respect for the law, and provide[ ] just punishment [to] deter others from . . . being involved in like conduct . . . ." 18 U.S.C. § 3553(a). It is unclear what more Armstrong believes the judge should have said. We rejected a similar argument in *Carty*, holding that when "the judge state[s] that he reviewed the papers [and] the papers discussed the applicability of § 3553(a) factors . . . we take it that the judge considered the relevant factors." *Carty*, 520 F.3d 984, 996 (9th Cir. 2008) (en banc).

---

tory and characteristics of the defendant." It also states that "[t]he court shall impose a sentence sufficient, but not greater than necessary . . . " "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment."

[6]The Supreme Court has held that mandatory application of the Guidelines would violate the Sixth Amendment. *See United States v. Booker*, 543 U.S. 220, 245 (2005).

Certainly, a court must give a sufficient explanation to the defendant once it selects a sentence. What constitutes a sufficient explanation, however, varies and depends upon "the complexity of the particular case, whether the sentence chosen is inside or outside the Guidelines, and the strength and seriousness of the proffered reasons for imposing a sentence that differs from the Guidelines range." *Carty*, 520 F. 3d at 992. A sentence inside the Guidelines range generally needs little explanation. *See id.*

**[8]** In *Rita v. United States*, 551 U.S. 338, 347 (2007), the Supreme Court held that a court of appeals may presume that the sentence is reasonable when a district judge's discretionary decision accords with the sentence that the Commission deems appropriate. Although we have declined to adopt the "presumption of reasonableness" for sentences imposed within the Guidelines range, we nonetheless acknowledge "that a correctly calculated Guidelines sentence will normally not be found unreasonable on appeal."[7] *Carty*, 520 F.3d at 988.

**[9]** In this case, the district judge explained his reasons for imposing both the § 3C1.1 and the § 3A1.1 enhancements; explained why he rejected Armstrong's position by pointing to the jury's findings and the testimony and evidence in the record; calculated the sentence according to the Sentencing Guidelines; stated that the Guidelines were just one of the factors he considered; and finally stated that he had "reviewed and looked at the 3553(a) factors and considered all arguments concerning the same." Perhaps most noteworthy is that the judge gave a sentence that was within and at the low end of the Guidelines. Because the arguments were straightfor-

---

[7]We also agreed with the Supreme Court's observation that "where a matter is . . . conceptually simple . . . and the record makes clear that the sentencing judge considered the evidence and arguments, we do not believe the law requires the judge to write more extensively." *Carty*, 520 F.3d at 995 n.11 (2008) (quoting *Rita*, 551 U.S. at 359).

ward and uncomplicated, the district judge gave Armstrong ample explanation. *See Carty*, 520 F.3d at 995.

## III.

The district court correctly applied the enhancements for selecting a victim based on race and obstruction of justice. The judge's findings are supported by the record and are not clearly erroneous. The sentence is AFFIRMED.