**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

ANTHONY PISARSKI; SONNY MOORE,
*Defendants-Appellees.*

</td><td>

No. 17-10428

D.C. Nos.
3:14-cr-00278-RS-1
3:14-cr-00278-RS-2
3:14-cr-00278-RS

OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted December 3, 2019
San Diego, California

Filed July 10, 2020

Before: J. Clifford Wallace, Eugene E. Siler,[*] and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown;
Dissent by Judge Wallace

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the
U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed the district court's pre-sentencing order enjoining the government from spending additional funds on the prosecution of Andrew Pisarski and Sonny Moore, who pled guilty to federal conspiracy to manufacture and possess with intent to distribute marijuana.

Before sentencing, Congress enacted an appropriations rider that prohibited the Department of Justice from using congressionally-allocated funding to prevent states from implementing their medical marijuana laws. The district court stayed sentencing. Applying *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016), the district court found that Pisarski and Moore strictly complied with California's medical marijuana laws, and enjoined government expenditures on the case until and unless a future appropriations bill permits the government to proceed.

As a threshold mater, the panel held that the appropriations rider does not bar the government from spending funds on this appeal. The panel then held that the district court did not err in its legal analysis, properly focused its *McIntosh* hearing on the conduct underlying the charge, and did not clearly err in determining that Pisarski and Moore proved by a preponderance of the evidence that they were in strict compliance with California's Medical Marijuana Program Act at the time of their arrest.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Judge Wallace dissented because, in his view, the district court did not properly interpret California law bearing on the question presented under *McIntosh*: whether defendants' conduct was *completely* authorized by California law such that it could be said that defendants *strictly* complied with all conditions of California law as to the use, distribution, possession, and cultivation of medical marijuana. Following Ninth Circuit precedent, Judge Wallace would hold that the district court's errors all turned on its faulty legal conclusions about how California law applies to criminal defendants charged with cultivating distributable quantities of marijuana for prospective sales.

Judge Wallace explained that at the time of defendants' charged conduct, there was a general prohibition against possession or distribution of marijuana in California. California established statutory exemptions from prosecution only in narrow and carefully-delineated circumstances. In Judge Wallace's view, defendants failed to provide evidence bearing on the question whether those narrow circumstances applied in this case. Judge Wallace would hold that the defendants therefore necessarily failed to carry their burden under Ninth Circuit precedent.

First, Judge Wallace explained that at the time of defendants' charged conduct, a medical marijuana grower in California could not lawfully earn a profit. The California Attorney General's Guidelines, which California state courts have said must be given "considerable weight," require collectives and cooperatives to document each member's contribution of labor, resources, or money to the enterprise. Although it was unknown at the time of the marijuana seizure how many of defendants' 327 marijuana plants were female and therefore capable of maturity, Judge Wallace observed that defendants did not provide the district

court with an estimate of their expected revenue or an accounting of their labor and operational costs from cultivating the plants. Examining an analogous California intermediate appellate decision, Judge Wallace would hold that the district court erred in concluding that California law "does not speak to the issue of prospective compliance." Applying de novo review, Judge Wallace concluded that the district court failed to assess whether defendants would have earned an unlawful profit from the expected sale of their 327 plant-grow.

Second, Judge Wallace explained that at the time of defendants' charged conduct, a criminal defendant in California was required to prove that every member of the collective for which he was cultivating marijuana was a qualified patient or a primary caregiver. In other words, the exemptions in California medical marijuana law did not apply to criminal defendants who failed to establish that the members of the collective were either qualified patients or primary caregivers. Judge Wallace observed that defendants did not present any evidence showing whether "other patients" were qualified patients or primary caregivers even though defendants' evidence referred to "other" unidentified patients and collectives. In Judge Wallace's view, California case law states that even when sales are expected to be made at an unknown time in the future, the membership status of a charged grow should be identified before a criminal defendant may benefit from the narrow exemption under California medical marijuana law. Following Ninth Circuit precedent, Judge Wallace would hold that where a district court, as here, fails to make necessary findings of fact bearing on the *McIntosh* inquiry, the parameters of strict compliance have not been followed.

Third, Judge Wallace would hold that the district court's conclusion that "the presence of cash, precious metals, and weapons" were "equally consistent with the operation of a rural, cash-intensive enterprise" necessarily failed to satisfy *Evan*'s preponderance of the evidence standard. In Judge Wallace's view, if defendants' evidence made it equally possible that defendants complied or did not comply with California law, defendants necessarily failed to meet their burden under *Evans*.

In sum, Judge Wallace would hold that the district court committed reversible legal error. He would reject the majority opinion's application of clear error as inconsistent with Ninth Circuit precedent because the district court's errors all turned on an incorrect statement of California state law. Judge Wallace fears that as a result of the majority opinion, district courts may now adopt a proportionality approach in a case in which a resident is charged with possession of distributable quantities of marijuana, staying a federal marijuana prosecution so long as there is a theoretical possibility of compliance with a state's medical marijuana law at an unknown time in the future. Judge Wallace would hold that this outcome is inconsistent with both Ninth Circuit precedent and with the relevant California medical marijuana law governing defendants' charged conduct.

## COUNSEL

Vijay Shanker (argued), Attorney; Matthew S. Miner, Deputy Assistant Attorney General; Brian A. Benczkowski, Assistant Attorney General; United States Department of Justice, Criminal Division, Appellate Section, Washington, D.C.; J. Douglas Wilson, Helen L. Gilbert, and Merry Jean Chan, Assistant United States Attorneys, United States

Attorney's Office; San Francisco, California; for Plaintiff-Appellant.

Ronald N. Richards (argued), Law Offices of Ronald Richards, Beverly Hills, California; T. Louis Palazzo, Palazzo Law Firm, Las Vegas, Nevada; for Defendants-Appellees.

## OPINION

McKEOWN, Circuit Judge:

Andrew Pisarski and Sonny Moore were in a pickle. The two men had spent months growing hundreds of marijuana plants. Although they had not yet sold, or even harvested, any plants, Pisarski and Moore had entered into sale agreements with two marijuana collectives, promising to sell them any viable plants for no profit, simply a reimbursement of costs. Before they could benefit from the fruits of their labor, federal law enforcement officers raided their rural Humboldt County property. The government charged them with federal conspiracy to manufacture and possess with intent to distribute marijuana. With few appealing options, Pisarski and Moore pled guilty.

Before sentencing, Congress passed the Consolidated and Further Continuing Appropriations Act of 2015 ("Appropriations Act of 2015"), which put the kibosh on all expenditures of federal prosecutions for marijuana use, possession, or cultivation if the defendant complied with the state's medical marijuana laws. Consistent with our decision in *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016), the district court enjoined the government from spending additional funds on the prosecution, finding that Pisarski and

Moore strictly complied with California's medical marijuana laws. Resolution of this appeal rests on the application of state law and our clear error review of the district court's factual findings.

## BACKGROUND

In 1996, California began its experiment with marijuana legalization when voters approved the Compassionate Use Act ("CUA"). The CUA decriminalized possession and cultivation of marijuana for medical use, Cal. Health & Safety Code § 11362.5, and provided immunity from prosecution for marijuana possession and cultivation to a "patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." *Id*. at § 11362.5(b)(2)(d).

In 2003, the state expanded legalization in the Medical Marijuana Program Act ("MMPA"), which permitted the possession, cultivation, possession for sale, and sale of marijuana to "qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order collectively or cooperatively to cultivate cannabis for medicinal purposes." *Id*. at § 11362.775(a). At the time of Pisarski and Moore's arrest in July 2012, California prohibited the sale, possession, and cultivation of marijuana, aside from the immunities in CUA and MMPA. *Id*. at §§ 11357–11360.

During the almost twenty years that California provided these immunities, the federal government continued to prosecute marijuana-related crimes. Resolving this tension, Congress enacted the Appropriations Act of 2015, which

prohibited the Department of Justice from using congressionally-allocated funding to prevent states from implementing their medical marijuana laws. Consolidated and Further Continuing Appropriations Act Of 2015, Pub. L. No. 113–235, § 538, 128 Stat. 2130, 2217 (2014) ("the appropriations rider" or "§ 538"). The relevant section of the appropriations rider reads:

> None of the funds made available in this Act to the Department of Justice may be used, with respect to [those states that have legalized medical marijuana] to prevent such States from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

*Id.*[1] A nearly identical rider has been extended in every subsequent appropriations bill. *See United States v. Kleinman*, 880 F.3d 1020, 1027 (9th Cir. 2017) (describing legislative history).

Which brings us back to Pisarski and Moore. By the time the appropriations rider was enacted, Pisarski and Moore had pled guilty to conspiracy to manufacture and possess with intent to distribute marijuana. 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846. The plea came on the heels of the 2012 search, which uncovered 327 marijuana plants, $416,125 in cash, and two loaded firearms. Two additional searches in

---

[1] When the court stayed the sentencing in this case, the rider was contained within § 537 of the 2017 Consolidated Appropriations Act. Pub. L. No. 115–31, 131 Stat. 135, 228.

2013 revealed an additional firearm, ammunition, and a treasure trove of gold and silver bars and coins.

Fortuitously for Pisarski and Moore, the passage of the appropriations rider intervened before their impending sentencing date. The district court stayed sentencing until we addressed the effect of the rider in *McIntosh*. The district court then, applying *McIntosh*, held a hearing and found that "any potential [marijuana] sale was sufficiently far into the future that, by the time of such sale, [the defendants] would have had ample time to ensure every aspect of it complied with the [MMPA]." *United States v. Pisarski*, 274 F. Supp. 3d 1032, 1039 (N.D. Cal. 2017). As a consequence of this finding, the court enjoined government expenditures on the case "until and unless a future appropriations bill permits the government to proceed." *Id*. at 1040.

## ANALYSIS

As a threshold matter, and one of first impression, we have no trouble concluding that the appropriations rider does not bar the government from spending funds on this appeal and that the district court's *McIntosh* finding does not provide defendants with an impenetrable bulwark. Pisarski and Moore argue that allowing the government to proceed in this appeal would create a judicial remedy in contravention of congressional intent. That approach puts the cart before the horse.

In *McIntosh*, we held that defendants may seek to enjoin the expenditure of DOJ funds *only if* they "strictly comply with all state-law conditions regarding the use, distribution, possession, and cultivation of medical marijuana." 833 F.3d at 1178. We reiterated this principle in *United States v. Evans*, explaining that because prosecution of non-compliant defendants "does not prevent the implementation"

of state marijuana laws, defendants cannot enjoin their prosecutions *unless* they "strictly complied with all relevant conditions."  929 F.3d 1073, 1076 (9th Cir. 2019) (quoting *McIntosh*, 833 F.3d at 1178–79).  The appropriations rider does not, however, bar the government from spending funds to determine whether the rider applies to the prosecution in the first place.  To hold otherwise would render a district court's *McIntosh* finding unreviewable.

Our decision in *Kleinman* offers Pisarski and Moore no refuge.  Because Kleinman's underlying conduct involved marijuana sales that were "definitively prosecutable," the rider did not preclude the government's defense of the appeal.  880 F.3d at 1030.  Nothing in *Kleinman* suggests that the DOJ cannot appeal a *McIntosh* finding.

We turn to the heart of this dispute: whether the defendants strictly complied with California's medical marijuana laws.  This is a question of state law.  There is no dispute that defendants bear the burden of proof.[2]  To prevail in a *McIntosh* hearing, Pisarski and Moore must prove by a preponderance of the evidence that they have strictly complied with state medical marijuana laws.  *Evans*, 929 F.3d at 1076–77. We review de novo the district court's interpretation of California law. *Asante v. California Dep't of Health Care Servs.*, 886 F.3d 795, 799 (9th Cir. 2018) (citing *In re McLinn*, 739 F.2d 1395, 1403 (9th Cir. 1984) (en banc)).  Here, the court was in command of state law

---

[2] We acknowledge that on occasion the district court referenced the government's failure to present evidence.  Although the government argues that such comments signal that the court impermissibly shifted the *McIntosh* burden off of Pisarski and Moore's shoulders, these references instead speak to the district court's assessment of the scope of the charged conduct and, accordingly, the scope of the *McIntosh* inquiry itself.  The court did not shift the burden of proof.

principles, laid out the statute and related cases, and well understood the parameters of strict compliance. The district court did not err in its legal analysis. The parties' disagreement instead rests on the district court's factual findings, to which we owe considerable deference. Because the district court's *McIntosh* determination hinges on its factual findings, we review for clear error.[3] *Id.* at 1078 ("[Defendants] challenge the district court's factual finding that they did not 'strictly comply' with [the MMPA]. Although we review a district court's interpretation of state law de novo, when the district court's determination turns upon factual findings, we review for clear error.") (internal citations omitted).

The district court characterized this case as "something of a temporal conundrum," explaining that on the date of the charged conduct, it was not apparent that the MMPA would have imposed any compliance requirements for speculative future marijuana sales.[4] *Pisarski*, 274 F. Supp. 3d at 1038. The court first outlined the statute and state law. Importantly, it then considered the evidence in light of the charges and underlying law.

We have no difficulty concluding that the district court did not clearly err in determining that Pisarski and Moore proved by a preponderance of evidence that they were in strict compliance with California medical marijuana law at the time of their arrest. *Evans*, 929 F.3d at 1078. A thorough

---

[3] Though the dissent claims that its analysis is predicated on legal error, its focus on factual issues paints a different picture and accounts for the dissent's misguided conclusions.

[4] The CUA is inapplicable because it does not offer immunity from criminal sanction for possession for sale. *See* CAL. HEALTH & SAFETY CODE § 11362.5.

review of the record does not leave us with a "definite and firm conviction that a mistake has been committed," *United States v. Silverman*, 861 F.2d 571, 577 (9th Cir. 1988) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)), and, as such, we affirm the district court.

Our inquiry begins with the charged conduct. *McIntosh* does not allocate a Herculean burden to Pisarski and Moore; rather, the appropriations rider "focuses on the *conduct forming the basis of a particular charge*." *Kleinman*, 880 F.3d at 1028 (emphasis added). Pisarski and Moore each pled guilty to one count of conspiracy to manufacture and possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846. These charges are mirrored in their laconic plea agreements, in which each made the following factual admissions:

> Beginning at an unknown date and continuing to at least July 10, 2012, there was an agreement between me and another individual to manufacture and possess marijuana on property in Humboldt County. During this period, I knowingly grew and possessed marijuana on this property, and I did so with the intention to sell marijuana to others. I agree and stipulate that the total amount of marijuana for purposes of relevant conduct is 32 kilograms, consisting of 320 marijuana plants.

The government did not charge any past marijuana sales. Nor did the government detail any specific impending marijuana sales. The men did admit that the firearms, ammunition, cash, silver, and gold recovered during the

search warrants were "derived from proceeds obtained, directly or indirectly, as a result of the violation [pleaded to], and/or [were] used or intended to be used, in any manner or in part, to commit or to facilitate the commission of the violation." *Pisarski*, 274 F. Supp. 3d at 1035.

The district court appropriately focused the *McIntosh* inquiry on the intended future sales of the plants being grown on the Humboldt property. With an eye toward this conduct, the court determined that, as of the date of Pisarski and Moore's charged conduct, there was no provision of the MMPA with which they were out of compliance. It then made the following findings: that, to the extent any of the 327[5] marijuana plants were viable, Pisarski and Moore would have sold them to two marijuana collectives for a reimbursement of costs; that, although the men had not shown all members of the two collectives were qualified patients or primary caregivers, California law did not require them to do so "well before any sale"; that the presence of cash and precious metals on the Humboldt property was not evidence that Pisarski and Moore profited or would profit from unconsummated future sales and was consistent with reimbursement for past sales; that California law did not require Pisarski and Moore to have paid taxes at the time of their arrest given all relevant sales of marijuana were speculative; and that the presence of weapons and excessive amounts of cash on the Humboldt property was "equally consistent with the operation of a rural, cash-intensive enterprise" as it was with an unlawful marijuana operation, as the California Attorney General guidelines suggest. *Id.*

---

[5] Although the plea agreements reference only 320 marijuana plants, the district court found the men possessed and intended to sell 327 marijuana plants. This finding is supported by the search warrant of the Humboldt Property.

at 1038–39.    The court then concluded that "[i]n this context—where defendants are charged with intent to sell marijuana, but the details of such a prospective sale are thin at best . . .— [Pisarski and Moore's] suboptimal evidentiary showing is nonetheless sufficient." *Id.* at 1039–40.

The upshot of these findings is that they are thoroughly supported by the record and the district court did not err in concluding Pisarski and Moore were in strict compliance with California's medical marijuana laws.[6]    Even if they might have made a better evidentiary showing, it does not detract from the preponderance of evidence illustrating their strict compliance. And although the government details a laundry list of deficiencies in the district court's assessment of compliance, the government cannot overcome the high hurdle of our clear error standard.

The MMPA provides a defense to patients who participate in collectively or cooperatively cultivating marijuana if they "show that members of the collective or cooperative: (1) are qualified patients who have been prescribed marijuana for medicinal purposes, (2) collectively associate to cultivate marijuana, and (3) are not engaged in a profit-making enterprise." *People v. Jackson*, 210 Cal. App. 4th 525, 529 (2012); *see also* Cal. Health & Safety Code § 11362.775.

---

[6] Evidence at the *McIntosh* hearing indicated only that Pisarski would distribute marijuana from the plants on the property; nothing was said about Moore's potential sales.  Because they operated on the same property and both pled guilty to conspiracy to manufacture and possess with intent to distribute marijuana, the district court appropriately evaluated Moore's ability to invoke the collective cultivation defense on the basis of the same evidence.

The MMPA "does not specify what [is] meant by an association of persons who engage in collective or cooperative cultivation for medical purposes," but state courts have declined to interpret this requirement rigidly, explaining that the legislature did not mention formality, permissible number of persons, acceptable financial agreements, or distribution limitations in the statute. *People v. Orlosky*, 233 Cal. App. 4th 257, 267–68 (2015). Indeed, California state courts have applied the MMPA defense to two roommates who informally established a collective between themselves. *Id*. at 263–64, 271–72.

We note it is difficult to cherry pick a single principle from state case law to apply in the *McIntosh* context, because courts have emphasized that their findings rest on multiple non-dipositive factors. *See Jackson*, 210 Cal. App. 4th at 539 (explaining that the jury may consider multiple non-dispositive factors to determine if the MMPA defense applies, to include the testimony of the collective operators, the volume of the collective's business, the number of collective members, the non-profit status of the collective, and the existence or nonexistence of financial records); *cf Orlosky*, 233 Cal. App. 4th at 271 ("[a]lthough business formality has been identified as a *relevant evidentiary criterion* that increases in probative value as the size of the marijuana distribution enterprise increases, it has not been identified as a *mandatory* requirement that *automatically* excludes all informal collective cultivation arrangements") (emphasis in original).

The case of *People v. London* illustrates the highly factual nature of MMPA proceedings. 228 Cal. App. 4th 544 (2014). In *London*, a defendant grew marijuana for an informal collective, which would then distribute it among "[members] and the original suppliers of the plants." *Id*.

at 550. Significantly, the defendant presented *no* evidence that any of those individuals were qualified patients. *Id*. at 566. Faced with testimony from a police officer that the defendant had actually admitted to making a $20,000 profit from the plants, the defendant offered *no* evidence the plants would be distributed on a non-profit basis. *Id*. at 550, 566. Considering the constellation of relevant factors, the court concluded there was insufficient evidence to support an MMPA jury instruction. The court in *London* correctly looked to state law, case law, and the Attorney General guidelines to make a fact-bound evidentiary conclusion— just as the district court did here.

Ample evidence supports Pisarski and Moore's adherence to the collective requirements. Pisarski declared that any future sales from the 327 plants would be to the Covello Cut Off and Ramrattan collectives—two collectives to which he belonged. Unlike the defendant in *London*, Pisarski and Moore could account for the distribution of their entire future harvest. *See id*. at 566. This arrangement was confirmed by third-party declarations, coupled with cultivation agreements. Other evidence included multiple physician recommendations that corroborate the collective members' status as qualified patients. Although the defendants did not make a showing as to the status of all members within the two collectives, nothing required them to establish the status of all collective members months before any sale occurred.

Nor did the district court clearly err when it concluded that, "to the extent any of the yield of their 327 marijuana plants would have been sold, it would have been sold to a collective on a not-for-profit basis." *Pisarski*, 274 F. Supp. 3d at 1038. The only evidence before the court confirmed the disclaimer of any profit.

The government's reliance on *People v. Soli*s for the proposition that Pisarski and Moore lacked financial documentation for unconsummated sales makes no logical sense. 217 Cal. App. 4th 51 (2013). Importantly, in *Solis*, the court determined that Solis was not entitled to an MMPA defense because, among other things, Solis admitted to earning a personal salary of $80,000 from the collective's excess income. *Id*. at 58–59. Here, Pisarski and Moore expressly denied that they intended to earn a profit from sales of the marijuana, and the record provides a cornucopia of reasons for the presence of large amounts of cash on the property: the cash-intensive nature of marijuana operations, the rural nature of the Humboldt property, cash reimbursements from past marijuana sales to the two collectives, and income from Pisarski's horticultural business.

Similarly, because California law does not require a seller to obtain a permit or pay taxes before a sale is completed, the district court did not clearly err in concluding Pisarski and Moore strictly complied with the tax provisions in the MMPA. *See* Cal. Health & Safety Code § 11362.775(b)(4) (a collective or cooperative must be "in possession of a valid seller's permit issued by the State Board of Equalization").

Finally, although the government argues that the excessive amounts of cash and precious metals and the firearms and ammunition found on the property are suspicious, they are just that—suspicious. In the absence of other evidence, we credit the district court's finding that these items are "equally consistent with the operation of a rural, cash-intensive enterprise." While the California Attorney General counsels that "excessive amounts of cash" and "weapons" are indicia of illegal marijuana sales, these

guidelines are non-binding and do not trump evidentiary findings. *See* California Attorney General, "Guidelines for the Security and Non-Diversion of Marijuana Grown for Medical Use" at 11 (August 2008).

Because the district court properly focused the *McIntosh* hearing on the conduct underlying the charge, and because the district court's analysis of state law was not in error and its factual findings were not clearly erroneous, the court did not err in concluding that Pisarski and Moore met their burden to show that they were strictly compliant with the MMPA at the time of their arrest.

**AFFIRMED**.

---

WALLACE, Senior Circuit Judge, dissenting:

**I.**

In July 2012, federal government agents searched Defendants' property in California, seizing 327 marijuana plants, $416,125 in cash, multiple firearms, some of which were loaded, ammunition, gold, silver, an 18-foot tandem axle trailer, and a marijuana manufacturing machine. The seized cash was found bundled by rubber bands, then vacuum sealed in plastic, and then further wrapped in thick black plastic. Defendants pleaded guilty to a charge of conspiracy from an unknown date to July 10, 2012, to manufacture and possess with intent to distribute marijuana.

Before sentencing, Congress enacted an appropriations rider known as the Rohrabacher-Farr amendment, which under our decision in *McIntosh*, required district courts to enjoin federal marijuana prosecutions when the charged

conduct was "completely authorized" by state medical marijuana law. *United States v. McIntosh*, 833 F.3d 1163, 1177 (9th Cir. 2016). After presiding over an evidentiary hearing, the district court granted Defendants' motion to stay the prosecution under *McIntosh*. The government now appeals.

## II.

### A.

I agree with the majority that a district court's order staying a federal prosecution under *McIntosh* is appealable. "Congress intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit." *United States v. Wilson*, 420 U.S. 332, 337 (1975). Without a congressional mandate divesting us of our jurisdiction, we retain the power to review lower court decisions. *See McIntosh*, 833 F.3d at 1172–73.

Our statement that the appropriations rider "can prohibit continued DOJ expenditures even though a prosecution was properly initiated prior to [the rider's] enactment . . . and the same reasoning applies to continued expenditures on a direct appeal after conviction," *United States v. Kleinman*, 880 F.3d 1020, 1028 (9th Cir. 2017), does not suggest otherwise. In context, we meant to say that the Department of Justice could not expend funds in either the trial *or* our court *if* the appropriations rider applied, *i.e.*, *if* a criminal defendant strictly complied with state medical marijuana law. We did not say that the Department of Justice could not expend funds to challenge a district court's threshold determination that the appropriations rider applied so as to enjoin the prosecution. We therefore have jurisdiction to

resolve the government's appeal from the district court's stay of prosecution.

## B.

As a threshold matter, the government argues that the district court erred by addressing only the 327 marijuana plants seized on July 10, 2012. In the government's view, the charged conduct was not limited to those plants, and the district court accordingly failed to assess Defendants' compliance against the full scope of the conspiracy. I agree with the majority that the district court properly focused its analysis on the 327 marijuana plants.

In evaluating the application of the appropriations rider, we "focus[] on the conduct forming the basis of a particular charge." *Kleinman*, 880 F.3d at 1028. Although Defendants were charged with conspiracy to manufacture and possess with intent to distribute marijuana from "an unknown date and continuing until at least until July 10, 2012," and although there is evidence of Defendants' past sales to a collective as far back as 2010—which hundreds of thousands of dollars in cash found on Defendants' property corroborates—Defendants had fortuitously entered into Plea Agreements circumscribing the scope of their charged conduct.[1] In their Plea Agreements, Defendants stipulated that "the total amount of marijuana attributable [] *for purposes of relevant conduct* is 32 kilograms, consisting of

---

[1] If Defendants had not entered into the Plea Agreements, the plain meaning of the Information would have governed the scope of the *McIntosh* analysis. *See Kleinman*, 880 F.3d at 1028. We engage in a "count-by-count analysis to determine which charges, if any, are restricted by" the appropriations rider. *Id.* I do not interpret the Information to limit the scope of the charged conduct to the cultivation of the 327 marijuana plants seized on July 10, 2012.

320 marijuana plants." The language in Defendants' Plea Agreements therefore controls the scope of the *McIntosh* inquiry in this case.

In any event, the government cannot now argue that the district court's *McIntosh* analysis should have extended to Defendants' conduct beyond the 327 marijuana plants. Recognizing that the Plea Agreements had limited the conspiracy to the marijuana plants seized on July 10, 2012, the government told the district court that "the best reading of *McIntosh* is that we look to their conduct that is the basis of the charge, *and the basis of the charge is the 320 plants*." Relying on the parties' shared understanding, the district court evaluated Defendants' compliance based on their conduct connected with the 327 marijuana plants. As a former district court judge, I cannot fault him for doing so.

## C.

The majority next suggests that this appeal turns on the district court's factual findings, which we must review for clear error. *See United States v. Evans*, 929 F.3d 1073, 1078 (9th Cir. 2019) (citation omitted). However, this appeal turns instead on the district court's interpretation and application of state law, which we must review *de novo*. *See id.*, *quoting Garmon v. Cty. of Los Angeles*, 828 F.3d 837, 842 (9th Cir. 2016); *see also United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (reviewing de novo the district court's "application of fact to law" when it "requires reference to the values that animate legal principles"). Because the district court did not properly interpret or apply state law "bearing on whether [California] expressly authorized the use of medical marijuana," I respectfully dissent. *Evans*, 929 F.3d at 1078.

Applying the *McIntosh* inquiry, we "focus . . . on the statutory text." *McIntosh*, 833 F.3d at 1175. The appropriations rider prohibits the Department of Justice "from spending money on actions that prevent the Medical Marijuana States' giving practical effect to their state laws that authorize the use, distribution, possession, or cultivation of medical marijuana." *Id.* at 1176. By contrast, those "who do not strictly comply with all state-law conditions regarding the use, distribution, possession, and cultivation of medical marijuana have engaged in conduct that is unauthorized" may still be prosecuted. *Id*. at 1178.

Under *Mcintosh*, criminal defendants charged with violating federal marijuana laws must overcome an exacting burden—their conduct must be "completely" authorized by state law and must "strictly" comply with all conditions of state law as to the use, distribution, possession, and cultivation of medical marijuana. *Id.* at 1179. Criminal defendants must show "that it is more likely than not that the state's medical-marijuana laws 'completely authorized' their conduct." *Evans*, 929 F.3d at 1077.

In July 2012, the sale and possession of marijuana was generally unlawful in California. *See* Cal. Health & Safety Code §§ 11359, 11360. The Medical Marijuana Program Act (MMPA) exempted from prosecution qualified patients and their primary caregivers who cultivated marijuana for medicinal purposes. *See id.* § 11362.775(a). As mandated by statute, California's Attorney General issued guidelines defining the scope of the MMPA to "ensure the security and nondiversion of cannabis grown for medicinal use." *Id.* § 11362.81(d); *Guidelines for the Security and Non-diversion of Marijuana Grown for Medical Use* (Aug. 2008) (Guidelines). Although the Guidelines "are not binding on the courts," they "are entitled to considerable weight."

*People v. London*, 175 Cal. Rptr. 3d 392, 402 (Ct. App. 2014) (internal quotation marks and citations omitted).

The majority says that the Guidelines "do not trump" the district court's "evidentiary findings." But that pronouncement puts the cart before the horse. In evaluating whether Defendants strictly complied with California law, the district court was required to consider the Guidelines, the MMPA, and all relevant California judicial decisions. *Cf. Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (observing that "whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern").[2]

To effectuate the narrow protections in the MMPA, criminal defendants in California may invoke a cultivation defense by showing that the members of the collective or cooperative: (1) are qualified patients who have been prescribed marijuana for medicinal purposes; (2) collectively associate to cultivate marijuana, and (3) are not engaged in a profit-making enterprise. *See People v. Jackson*, 148 Cal. Rptr. 3d 375, 377 (Ct. App. 2012). Criminal defendants carry the "minimal burden" of raising a "reasonable doubt as to whether the elements of the defense[] have been proven." *Id.* at 380.[3]

---

[2] We may also "consider unpublished state decisions even though such opinions have no precedential value." *Employers Ins. Of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 (9th Cir. 2003), *citing Nunez v. City of San Diego*, 114 F.3d 935, 943 n.4 (9th Cir. 1997).

[3] Once a criminal defendant raises a reasonable doubt about the medical marijuana defense to permit the defense, the burden shifts to the government to disprove the defense. *See People v. Orlosky*, 182 Cal. Rptr. 3d 561, 571 (Ct. App. 2015). I rely on California state court

Thus, at the time of Defendants' charged conduct, a medical marijuana grower in California could not lawfully earn a profit. *See* Cal. Health & Safety Code § 11362.765(a) (providing that nothing in the provision exempts from prosecution "any individual or group to cultivate or distribute cannabis for profit"). Instead, a qualified patient or valid identification cardholder could only receive reasonable compensation for his labor or services rendered in cultivating medical marijuana for other qualified patient members of his nonprofit group, plus reimbursement for his out-of-pocket expenses incurred. *See London*, 175 Cal. Rptr. 3d at 411–412, *citing* Guidelines § IV.B.1, B.6.

The California intermediate appellate court decision, *People v. London*, highlights the legal principles underlying California's rule against profit-making. *See* 175 Cal. Rptr. 3d 392. In *London*, the defendant was charged with cultivating marijuana and possessing marijuana for sale under California law. *Id.* at 397. The defendant was given 100 immature marijuana plants from the collective of which he was a member. *Id.* at 398. In total, the defendant had invested $10,000 in his growing operation, and he claimed to expect to be reimbursed for his costs of growing the plants, including the time and effort involved in growing the plants. *Id.* at 399. At his trial, the defendant invoked the MMPA cultivation defense, saying that he did not expect an "unlawful profit for cultivating the 100 marijuana plants for the collective." *Id.* at 406. The defendant tried to introduce expert testimony to prove that he had not expected to earn an

decisions addressing a criminal defendant's threshold minimal burden, and not the more onerous burden imposed on the government "to disprove the defense beyond a reasonable doubt." *Id.*

unlawful profit based on future sales.  *Id.*  However, the trial court limited the scope of the expert testimony.  *Id.*

The court held that the defendant's expert "lacked a sufficient evidentiary foundation to opine that defendant was earning an unlawful profit for cultivating the 100 marijuana plants for the collective."  *Id.*, *citing* Cal. Health & Safety Code § 11362.765(a); Guidelines, § IV. B.6.  The court reasoned that the defendant had not explained "how much he expected to earn from his 100-plant grow and any additional 'grows' for the collective."  *Id.*  The defendant had also failed to "estimate the amount of time and effort he had invested and expected to invest in his 100-plant grow and in his planned additional grows, or tie that amount of time and effort to the amount of compensation he expected to earn for cultivating marijuana for his collective."  *Id.*, *citing* Guidelines, § IV.B.4 (stating that "collectives and cooperatives should document each member's contribution of labor, resources, or money to the enterprise").  The defendant was required to supply "evidence tying the reasonable value of defendant's cultivation services to the amount of compensation he expected to be paid for the marijuana plants he was growing."  *Id.*

In this portion of *London*, the court relied extensively on the Guidelines and the substantive authorizations of the MMPA.  *Id.*  In a separate part of the opinion, the court also held that there was insufficient evidence to support the MMPA defense instruction.  *Id.* at 410.  Although the marijuana plants had not yet matured and had not yet been sold, the court engaged in a rigorous analysis of the

defendant's compliance with the MMPA and the Guidelines.[4]

In this case, Defendants did not provide the district court with an estimate of their expected revenue or an accounting of their labor and operational costs from cultivating the 327 marijuana plants. As in *London*, it was unknown how many marijuana plants were female and therefore capable of maturity.

In addition, like Defendants did here, the defendant in *London* claimed that he had not expected to earn an unlawful profit from the sale of the marijuana plants. *See London*, 175 Cal. Rptr. 3d at 397 (addressing defendant's claim that the "$20,000 sum he expected to be paid for his 100 marijuana plants, when fully grown, did not include an unlawful profit"). And here, as in *London*, there is evidence about expected payments relating to the marijuana plants underlying the charged conduct. In his declaration filed with the district court, Jon Rasmussen, an agent working for the United States Drug Enforcement Administration, said that Anthony Stewart had told him that Anthony Pisarski would pay him about $15,000 for the grow season.

---

[4] California courts consider the absence of an accounting of expenses in evaluating a criminal defendant's compliance with the MMPA even where the marijuana plants underlying the criminal charge have not yet matured. *See People v. Matteucci*, No. F07491, 2017 WL 1533485, at *14 (Cal. Ct. App. 2017) ("The 482 marijuana plants, if grown to maturity, would produce vastly more marijuana than [the] recommendations. Although [the defendant] claimed he was reimbursed only for his expenses, he did not keep close track of his expenses and accepted monetary 'donations' without regard to whether the amount covered overhead costs and operating expenses").

Despite the clear guidance from *London*, the district court nonetheless said that the MMPA "offers immunity from prosecution for possession for sale" and that it "does not speak to the issue of prospective compliance, but rather seems concerned with contemporaneous conditions." *United States v. Pisarski*, 274 F. Supp. 3d 1032, 1038 (N.D. Cal. 2017). Examining the principles animating the MMPA de novo,[5] this was error. *London* expressly tells us that the MMPA *does* speak to issue of prospective compliance. The district court accordingly failed to assess whether Defendants would have earned an unlawful profit from the expected sale of their 327 plant-grow.

In addition, under the MMPA, a criminal defendant must show that every member of the collective for which he is cultivating marijuana is a qualified patient or a primary caregiver. *See* Cal. Health & Safety Code § 11362.775(a). At the time of the charged conduct, Defendants could lawfully distribute medical marijuana only to "qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards." *Id.* § 11362.765(a). The MMPA "protections *cannot* apply" to a criminal defendant who has not established that the "proffered" members of the collective are "qualified patients" or "primary caregiver[s]."

---

[5] The possibility of compliance is not a substitute for affirmative proof of compliance with the MMPA. *See People v. Rodriguez*, No. F071705, 2017 WL 2609599, at *5 (Cal. Ct. App. 2017) ("The question is whether the record raised a reasonable doubt regarding the existence of each element of the offense. While the evidence showing $80 of revenue and $7 for some of the costs did not suffice to prove there *was* a profit, it naturally did not tend to show the sale was not for profit either" (emphasis in original)).

*People v. Frazier*, 27 Cal. Rptr. 3d 336, 350 (Ct. App. 2005) (emphasis added).

*London* is again instructive. The defendant there testified that "half of the marijuana he harvested from his 100-plant grow would be given to his cousin . . . ." 75 Cal. Rptr. 3d at 411. Nonetheless, the court concluded that defendant's lawful cultivation MMPA defense "fell short of raising a reasonable doubt that the defendant was lawfully cultivating and lawfully possessing marijuana" because there was no evidence "that any of the marijuana harvested from defendant's grow would be given for free or sold, on a nonprofit basis, *solely* to qualified patient members of the collective." *Id.* (emphasis in original).

Here, Defendants presented evidence that the collectives were "closed-circuit," *i.e.*, that there were no purchases or sales to or from non-members of the collectives. However, the evidence also refers to "other" unidentified patients and collectives. Defendants did not present *any* evidence demonstrating whether the "other patients" were qualified patients or primary caregivers[6]. On this record, there is no way to ascertain whether the exemption in the MMPA applies. The district court therefore necessarily failed to make findings bearing on the question whether Defendants'

---

[6] The majority says that unlike the defendant in *London*, the Defendants here "could account for the distribution of their entire future harvest." But even if the district court made such a factual finding, that did not obviate Defendants' burden to show that the unidentified "other patients" of the collectives were qualified patients or primary caregivers under the MMPA. Nor did that obviate Defendants' burden to show that their expected distribution would not result in an unlawful profit under California law.

conduct was "completely authorized" under California law to justify enjoining this federal marijuana prosecution.

The majority says that the district court "understood the parameters of strict compliance." But where, as here, a district court fails to make necessary findings of fact bearing on the *McIntosh* inquiry, the parameters of *strict* compliance have not been followed.

The majority later acknowledges that Defendants "did not make a showing as to the status of all members within the two collectives" but nonetheless concludes that "nothing required them to establish the status of all collective members months before any sale occurred." But California law, as interpreted in *London*, tells us otherwise. *See London*, 75 Cal. Rptr. 3d at 411. In *London*, the sales were also expected to be made at an unknown time in the future, and the testimony about the membership status of half of the charged grow was inadequate. *Id.*; *see also People v. Garrett*, No. C079468, 2017 WL 2609544, at *8 (Cal. Ct. App. 2017) (observing that a defendant's failure to gather information about the alleged collective counsels against a MMPA cultivation defense because "business and membership records were likely available had defendant actually tried in advance to obtain them").[7]

Finally, Defendants have failed to rebut the various indicia of an unlawful marijuana operation under California

---

[7] In making this determination, the district court also appeared to shift the burden of proof impermissibly to the government. *See Pisarski*, 274 F. Supp. 3d at 1039 (stating that "the government has not identified a single member of either collective who was *not* a qualified patient or caregiver" (emphasis in original)).

law.  The Guidelines include a list of "Indicia of Unlawful Operations:"

> When investigating collectives or cooperatives, law enforcement officers should be alert for signs of mass production or illegal sales, including (a) excessive amounts of marijuana, (b) excessive amounts of cash, (c) failure to follow local and state laws applicable to similar businesses, such as maintenance of any required licenses and payment of any required taxes, including sales taxes, (d) weapons, (e) illicit drugs, (f) purchases from, or sales or distribution to, non-members, or (g) distribution outside of California.

Guidelines § IV.C.2.  The government argues that the cash, silver, gold, loaded guns, and ammunition found on the Defendants' property are indicia of unlawful marijuana use. The district court rejected this argument, reasoning that "the presence of cash, precious metals, and weapons *is equally consistent* with the operation of a rural, cash-intensive enterprise."

But "evidence in equipoise is not enough" to satisfy the preponderance of the evidence standard.  *United States v. Alvarado-Guizar*, 361 F.3d 597, 602 (9th Cir. 2004).  The only reasoning in support of the district court's conclusion is that the evidence equally supports two competing theories. If Defendants' evidence made it "equally" possible that they complied or did not comply with state law, they have necessarily failed to meet their burden under *Evans*.

**D.**

In the majority's view,  I "focus on factual issues" and this "accounts for" my "misguided conclusions."  Again, the majority is mistaken.

Our controlling precedent tells us that the *McIntosh* analysis involves two parts.  In the first part, district courts must examine the state statutes and judicial decisions "bearing on whether [the state] expressly authorized the use of medical marijuana." *Evans*, 929 F.3d at 1078.  We have said that district courts must determine "all relevant conditions imposed by state law on the use, distribution, possession, and cultivation of medical marijuana." *McIntosh*, 833 F.3d at 1079.  This is a legal inquiry, which we review de novo. *See Matter of McLinn*, 739 F.2d 1395, 1398 (9th Cir. 1984) (en banc) ("[A] decision to give less than full independent de novo review to the state law determinations of the district courts would be an abdication of our appellate responsibility").

In the second part, the district court must determine whether the criminal defendant's conduct "was completely authorized by state law"—that the defendant "strictly complied" with all of the state law examined in the first part. *McIntosh*, 833 F.3d at 1079.  We have explained that the question "whether [a defendant] strictly complied with California marijuana laws *may depend on specific findings of fact, as well as legal determinations*." *United States v. Lynch*, 903 F.3d 1061, 1087 (9th Cir. 2018) (emphasis added).  The second part may therefore depend on specific findings of fact, which we review for clear error, or on legal determinations, which we review de novo.

The majority relies on language from our decision in *Evans*, in which we said that "*when the district court's*

*determination turns upon factual findings*, we review for clear error." *Evans*, 929 F.3d at 1078 (emphasis added). In making this statement, we quoted from our decision in *United States v. Kent*, 649 F.3d 906, 912 (9th Cir. 2011). Our decision in *Kent* is instructive.

In *Kent*, we explained that a review for clear error is "appropriate [] when a determination of vindictive prosecution turned upon factual findings." *Id.* (citation omitted). However, we then said that since the law on "vindictive prosecution has developed, [] our review is now more commonly for mistakes of law, for which de novo review is appropriate." *Id.* (citation omitted). The statement in *Evans* on which the majority relies therefore only confirms what we said in *Lynch*: when the district court's *McIntosh* analysis turns on specific findings of fact, we review for clear error, but when the analysis turns on a legal issue, we apply de novo review.

The district court's *McIntosh* analysis did not "turn[] upon factual findings." *Evans*, 929 F.3d at 1078. Significantly, in reaching the straightforward conclusion that the district court committed reversible legal error, I do not reject or discount *any* of the district court's factual findings. Instead, the district court's errors all turned on its incorrect statement of law that California "does not offer much further guidance with respect to how compliance can be assessed prospectively." *Pisarski*, 274 F. Supp. 3d at 1038.

The majority says that the district court exuded a "command of state law principles." The majority says this is so, without adopting the district court's proportionality approach, and without offering an alternate framework to assess strict compliance with California law. Instead, the majority simply concludes that the district court did not clearly err in its factual findings. But there must be *some*

legal framework against which compliance for expected future sales is assessed. In my view, the district court's framework was faulty from the start, and the district court accordingly erred in its application of California law.

I fear that as a result of today's opinion, district courts may now adopt a proportionality approach in any case in which a California resident is charged with possession of distributable quantities of marijuana, staying a federal marijuana prosecution so long as there is a theoretical possibility of compliance at the time of a future sale. Neither our precedent nor California's sanctions this outcome.

## III.

A criminal defendant in possession of distribution quantities of marijuana must provide more than "sub-optimal" evidence to establish compliance with California law. That there were no past sales charged in this case did not obviate Defendants' burden to prove *strict* compliance with California medical marijuana law. By failing to consider or apply the substantive conditions of the MMPA and the Guidelines, and the principles animating them both, the district court erred.

I respectfully dissent.